Filed 10/22/13  In re L.L. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.L., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU, <br><br>        Plaintiff and Respondent, <br>v. <br>E.L., <br>        Defendant and Appellant. | A137943 <br><br> (Contra Costa County Super. Ct. No. J10-01107) |

## I.  INTRODUCTION

E.L. (Mother) appeals from the juvenile court's order denying her Welfare and Institutions Code section 388[1] petition and order terminating her parental rights following a hearing pursuant to section 366.26.  She argues that the trial court erred in denying her section 388 petition.  We disagree and affirm both orders.

## II. FACTUAL AND PROCEDURAL BACKGROUND

We previously heard and denied Mother's writ petition challenging the court's order setting this matter for a section 366.26 hearing.  (*In re L.L.* (Dec. 13, 2012, A136184) [nonpub. opn.].)  The following recitation of the facts in this matter prior to that decision is taken from our earlier opinion.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

1

L.L. first came to the attention of the Contra Costa County Children and Family Services Bureau (Bureau), on August 7, 2010, after Mother took her to the emergency room with the unfounded belief that L.L. had been molested. At the time, L.L. was four months old. Two days later, the Bureau interviewed Mother, as well as Mother's brother-in-law, sister, and grandfather. The Bureau discovered a serious history of mental illness and substance abuse by Mother, and L.L. was removed from Mother's custody.

In its detention/jurisdictional report filed October 20, 2010, the Bureau noted that Mother suffered from mental illness including bipolar disorder and schizophrenia and had stopped going to counseling and taking her medications. An interview with Mother's sister revealed that Mother might also have a problem with alcohol abuse.

In a disposition report dated November 16, 2010, the Bureau noted that Mother was receiving supervised visits of one hour a week with L.L. The Bureau provided bus tickets to Mother, referrals to parenting classes, a drug testing program, and referrals for therapy at a local clinic. The Bureau expressed concern that Mother continued to find non-existent physical ailments with L.L. at every visit, behavior which was consistent with Mother's mental illness. The Bureau recommended continued placement of L.L. with a foster family and supervised visits for Mother.

On December 7, 2010, the Bureau requested that Mother's visitation be decreased to two hourly monthly visits. The Bureau noted that, in the previous two visits, Mother had outbursts and was hostile towards county workers and that her behavior distressed L.L. In an order dated December 7, 2010, the court admonished Mother "not to make any verbal abusive comments or . . . any further hostile comments or gestures," toward county workers during these visits.

On December 29, 2010, the Bureau informed the court that Mother had been asked to leave the "Love a Child" shelter where she had previously been residing after she got into a domestic violence dispute with another resident. Mother also admitted to being aggressive towards L.L.'s alleged Father, C.T.

A dispositional hearing was held on January 11, 2011. At that time, the court ordered L.L. a dependent child, found that reasonable efforts had been made to prevent

the need for L.L.'s removal from the home, that removal from the home would not create a substantial risk to L.L.'s well being and also found clear and convincing evidence that there was substantial danger to L.L. if she was returned home, and there were no reasonable means to protect L.L. without removal of physical custody from Mother. The court ordered supervised visitation of one hour, two times a month. A reunification plan was adopted. The court informed Mother that if she was unable to resume custody of L.L. within six months, then a permanent plan, including termination of her parental rights, could be made. Mother did not appeal this order.

The Bureau filed a status review report for the six-month review hearing on August 15, 2011. The Bureau reported that Mother was living with her sister. Mother continued to suffer from paranoia and was not taking all of her medications. Mother, however, contended that she had been taking her medications as prescribed. Mother had seen L.L. on all her scheduled days except for one on June 8, 2011. Mother had been offered numerous services, including: bus tickets, supervised visits with L.L., referrals to parenting classes, referrals to Pittsburg Mental Health Clinic, and referrals for random drug testing. Mother was visiting L.L. twice a month and believed she had complied with all the requirements of the court. However, the Bureau was still concerned with Mother's mental health. Mother continued to see nonexistent ailments in L.L. when she visited her. In addition, Mother's sister had reservations about Mother's ability to care for L.L. The Bureau reported that Mother's lack of compliance with her prescribed medication regime and living situation made her unable to care for L.L. Mother had also not completed her parenting classes and her interactions with L.L. were not age appropriate. The Bureau requested that Mother's visitation be decreased to one hour once a month and that a section 366.26 hearing date be set.

In an order filed September 1, 2011, the court found that returning L.L. to her Mother would present a substantial risk to her health and safety and ordered additional services to be given to Mother, including a "Nurturing Parenting Program" and referrals to therapy. Mother was specifically ordered to attend individual therapy, to secure treatment for her mental health illnesses, and to continue her participation in the bipolar

3

support group at Contra Costa Mental Health. The court found that Mother participated in the case plan, and regularly contacted and visited L.L., and that if services were extended until October 7, 2011, there was a likely probability that L.L. would be returned to Mother. Visitation was kept at two hourly monthly visits. The court also found that the Bureau had provided reasonable services, a finding Mother did not challenge. Mother was informed that if she was unable to resume custody of L.L. by October 7, 2011, the court could make permanent plans for L.L. A 12-month hearing was set for September 26, 2011.

A status report was prepared for the September 26, 2011 hearing.[2] The Bureau reported that L.L. showed stress when leaving her foster parents to see Mother, and that continued placement with the foster family was in L.L.'s best interest. Additionally, L.L. had started to hide when the social worker picked her up to see Mother. Even though Mother could have started individual therapy as early as February 14, 2011, she did not start until September 19, 2011. Because she was noncompliant with her oral medications, Mother was prescribed bi-monthly injections, which she did not begin until August 16, 2011. Mother continued to see nonexistent physical ailments in L.L. and exhibited paranoid behavior during her visits with L.L. Mother's sister had reservations about Mother's ability to care for L.L. and stated that Mother spent all day at home sleeping and did not help out around the house. However, after being informed that L.L. might be permanently taken away, she changed her statement and told the Bureau that Mother was fine and could care for L.L. Mother's mental health physician noted that Mother was following up with her appointments because she wanted to regain custody of L.L. and not because she believed she could benefit from mental health treatment. Additionally, Mother's attendance at her bipolar support group was inconsistent. Mother was completely reliant on her sister for money and a place to live and yet had alienated her sister and the rest of Mother's family. Additionally, Mother had not made her mental

---

[2] Due to continued continuances the hearing was not held and a combined 12- and 18-month hearing was held on April 23, 2012.

health a priority. Throughout Mother's supervised visits with L.L., the case workers observed "delusional behavior, lability, and thought derailment." On two occasions, a public service officer had to remove Mother from the building where the visits took place.

Services provided to Mother included transportation of L.L. to Mother's parenting class, bus tickets for Mother, supervised visits, face to face interviews with Mother, referrals for individual therapy, referrals for random drug testing, and referrals to the Pittsburg Mental Health Clinic.

The Bureau recommended that reunification services be terminated, that the court determine reasonable services have been provided and that the matter be set for a section 366.26 hearing.

The Bureau filed a status report for the combined 12- and 18-month hearing on April 16, 2012, and the combined 12- and 18-month review was conducted on April 23, 2012.[3] In its report, the Bureau noted that Mother had started individual therapy and continued to receive bi-weekly injections of Risperdal to control her mental health illness. However, the Bureau remained concerned about Mother's financial inability to provide independent care for L.L. as well as her inability as a parent to respond to L.L.'s social cues. During her visits with L.L., Mother was still not completely engaged with L.L. and did not speak to her in an age appropriate fashion. The report also indicated that L.L. became fretful when she was taken on her visits to Mother. In a recent visit, Mother turned on a toy dinosaur that appeared to scare L.L. into running away and hiding in the social worker's lap. Mother repeated the action after L.L. calmed down and again scared the child. Mother became angry when the social worker admonished her.

At the April 23, 2012, hearing, Mother's counsel introduced evidence that Mother had successfully completed the Nurturing Parenting Program and received a positive letter of recommendation from the Child Development Coordinator, Toni Robertson.

---

[3] The hearing was conducted over the course of several months. In addition to the April 23, 2012, hearing, hearings were conducted on May 3, 2012, June 5, 2012, and July 16, 2012. All hearings will be collectively referred to as the "April 23, 2012 hearing."

Robertson's letter reported that she never observed Mother acting inappropriately with L.L. Mother's caseworker confirmed that Mother had started attending individual therapy on September 19, 2011, and was regularly attending therapy, but had missed 10 sessions between September 19, 2011, and April 24, 2012. The caseworker also testified that she received reports that Mother missed some of her injections in January and March 2012 and Mother admitted to missing approximately one, of her required two, injections per month.

The caseworker testified that Mother had made some progress in terms of parenting L.L., through working with Denah Hanson at Alternative Family Services. She also testified that based upon the positive recommendations Mother had received, Mother had made progress in the last six months towards controlling her mental health issues although no mental health professional had had the opinion that it would be safe to return L.L. to Mother. Neither had any of the mental health providers suggested giving Mother unsupervised visits with L.L.

On June 20, 2012, after testimony was concluded but before closing arguments commenced, Mother's counsel asked the court, "Is there any possibility of mom getting some expansive visits at the aunt's house?" The court responded, "I don't think so. I don't think so. Okay, whatever visitation scenario it is now, let's continue it." Counsel responded, "All right."

Closing arguments were held on July 16, 2012. The court expressed concern with the fact that "no mental health professional would render an opinion the child would be safe if returned to her mother." With regard to Mother's compliance with her case plan, the court noted that "mother did her best to complete that plan. I don't, for a moment, question her commitment and her concern, albeit very late in the process, because that's exactly what it is. It's late in the process." The court found that there was not a substantial probability that the minor would be returned to Mother and that it was in L.L.'s best interest that the matter be set for a section 366.26 hearing.

Mother filed a petition challenging this order on September 7, 2012. On December 13, 2012, we denied her petition.

6

On December 10, 2012, Mother filed a section 388 petition. In it, she alleged that she had "continued to improve her stability and has maintained her mental health treatment despite the courts [sic] termination of her services." Mother asked the court to set aside its order setting a section 366.26 hearing and asked the court to resume reunification services and increase visitation with the goal of "ultimate transition of the child back to mother's care." Mother argued that "[t]he child was removed because the mother's unstable mental health situation placed the child at risk. Mother has maintained her stability and is no longer a risk to the child. The child has a right to be raised within her birth family. Returning the child to a stable parent accomplishes that goal and achieves the stated purpose of the Child Welfare system—to preserve families."

Mother attached to her petition three documents: a letter dated October 31, 2012, from Mary LaGue, the clinical supervisor and outpatient program manager for Portia Bell Hume Behavioral Health and Training Center. In her letter, LaGue stated that Mother had attended weekly outpatient individual psychotherapy since September 19, 2011, for a total of 34 sessions. In a "Transfer Summary" dated October 12, 2012, and necessitated by the fact that Mother's current psychotherapist was leaving and Mother was transitioning to a new therapist, Mother's therapist stated that Mother "has achieved greater strength in her ability for emotional regulation and impulse control when overwhelming emotional episodes arise. She has also increased her ability to apply learned coping mechanisms as necessary. [Mother] continues to work on increasing self-esteem and self-worth, as well as development of her sense of self and identity. After losing her daughter, she has been working to find 'purpose' in her life and implement new activities and goals for her future to take the place of her original hopes to take care of her daughter. [Mother] is continuing to learn her values and beliefs and learning to stay true to them despite outside influences. In addition, she is grieving losses in her life, and attempting to adjust to the possible idea that she may not regain custody of her daughter, but is still engaged in court appeal to possibly get her back." Mother was described as "cooperative" and as presenting no potential "dangerousness."

7

Mother also attached a letter dated November 16, 2012, from a staff psychiatrist at Contra Costa Health Services. The letter stated that Mother "is currently maintained on her recommended treatment plan. In last few months her symptoms have improved significantly, she is responding very well to her medications, as evidenced by her stable mood, improved social interaction and alleviated psychiatric symptoms. [¶] [Mother's] insight pertaining to her mental illness and treatment plan has improved remarkably, compared to last year. At this time she is very committed to maintain on her medication regimen and following up regularly, with both medication and group therapy." A November 1, 2012, letter certified that Mother had been attending a bipolar support group since December 2010. Mother's attendance was consistent and she was an active participant.

The court set a hearing on Mother's section 388 request for January 28, 2013.

In a report dated January 23, 2013, the Bureau informed the court that it did not support Mother's request for additional services or increased visitation. The Bureau noted that L.L. was then two years and nine months old and had been detained for two years and five months of her life. L.L. continued to live in the foster home where she had been placed nearly two years earlier with caregivers who wished to adopt her.

The Bureau described the relationship between L.L. and Mother as "not significant." L.L. did not identify Mother as "mommy" but rather referred to her by her first name. Instead, L.L. calls her foster mother "mommy." During supervised visits, Mother "was able to interact appropriately" with L.L. "However, [L.L.] is more excited to see this worker at each visit than her mother. [L.L.] sets very clear boundaries with her mother and refutes any statements made that [appellant] is her mother."

With regard to Mother's mental health treatment, the Bureau noted that although Mother had been in treatment for over a year or more, she "has only shown improvement in the last few months. Mother has an extensive history of mental health instability and continues to be reliant upon her sister for housing and financial support." Although it acknowledged Mother's progress, the Bureau expressed the view that Mother cannot "take care of herself without the assistance of others." The Bureau based this conclusion

8

on the fact that Mother continued to be "reliant upon her sister for housing and financial support."

The hearing on Mother's request was held on January 31 and February 5, 2013. Mother testified that she had been in individual psychotherapy for more than a year. She had been diagnosed as bipolar and attended counseling for that illness. She also saw two other doctors, was involved in group therapy, took psychotropic medication and had a doctor monitoring that medication.

Therapy was helpful to Mother and she planned to continue in therapy "for my well-being sake." She was insured and so was able to continue financially. Mother also testified that she had been diagnosed with "really bad depression . . . ." She was able to overcome this depression by "[s]taying occupied . . . feeling needed."

Mother was taking a number of psychotropic medications. One of these medicines required a monthly injection, the other two came in pill form. Mother had been taking the medications regularly and found them helpful. She had no plans to stop taking them until a doctor advised her to. She saw a doctor every six to eight weeks to monitor the medication.

Mother attended a bipolar support group biweekly. She missed one session because it fell on her first day of a new job and three other sessions because she was unable to get transportation. However, Mother now had a car so she believed it would be easier to get to the sessions. She found the support group helpful and she planned to continue to attend. Mother had also found a job at Round Table Pizza and had been employed there for three weeks.

Mother disagreed with the Department's assertion that she could not take care of herself. She recently had found employment, made her own medical appointments, paid rent to her sister, was responsible for cleaning up the house she lived in with her sister. She also took her 15-year-old niece to school. Her sister had never given her "anything" and she did not rely on her for money.

Mother described herself as "not exactly where I want to be. I want to be in school and . . . I would like to have my own apartment." She was working toward having the money to move into her own place by working 30 hours a week.

Mother acknowledged that she would have to continue dealing with and monitoring her mental health and was prepared to do so. In counseling, she had learned to better identify her emotions and explain her feelings rather than acting out, as she used to do. She acknowledged that she had in the past had a problem sometimes controlling her emotions, but she had not had any issues in the last six to eight months. She attributed this improvement to extensive therapy.

In her visits with L.L., Mother would bring cheerios, and they would play games and with toys. L.L. appeared to enjoy these activities. Mother described L.L. as "very mature" and said she was "never upset about leaving" at the end of the visit. "She's the same coming in as going out."

Mother believed L.L. would benefit from an ongoing relationship with her because Mother was stable enough to be a presence in L.L.'s life, even if infrequently. Seeing L.L. would also benefit Mother "greatly." When asked whether Mother felt that L.L. loved her, she replied "I think that she's not conscious of the situation that we're going through right now. And, um, she does favor the people who are in her life most. I think that she's only comfortable with me like in a play setting and stuff. She's never spent— she's never even gone out to eat with me. We've never been to the park, nothing."

Mother testified that in the time that had elapsed since the review contest on July 16, she felt that "when it comes to stress and depressions and things like that I think that I can take more stress now. I feel like I have a stronger pain threshold. I feel my skin's a little thicker. I understand situations a little more in-depth than the way I did when all of this had began, so I'm—I feel stronger today even though I've been through a lot and everything is not exactly how I wish it would be . . . ."

Mother stated that she began taking medication for her mental health issues in February 2011, about six months after L.L. was detained. Before that she believed she was well enough to do without medication. Her doctor told her it was okay to decline to

10

take the medicine. When she first began taking medication she did so intermittently. In April or May, she began to take the medicine she'd been prescribed consistently.

Mother's sister testified that Mother had been living with her for a little over two years. She no longer provided Mother with all of her housing and financial support. She believed Mother was "doing a lot better with her issues that she had before since she moved into the house with me and . . . she's a lot more responsible. She pays rent with me. She pays bills. She just got a good job a couple weeks ago. She's been doing very good with that, with getting up and going to work. She's very helpful around the house. She takes care of her own bills." Mother had a driver's license and had bought a car and drove herself everywhere she needed to go. Mother's sister did not make Mother's appointments, monitor whether she went to her appointments and, in general, had seen no negative change in Mother's mental health since the last court hearing in July. Mother did not appear unstable, had no outbursts and had done nothing that would cause her any concern should Mother be taking care of a small child.

After hearing argument, the court denied Mother's motion, finding that she had not met her burden of showing a change in circumstances or her burden to show that granting the motion would be in L.L.'s best interests. The court held that Mother had not met her burden of proof. Mother had shown "changing circumstances" in her mental health treatment from the time of the court's last order six months earlier. The court also held that between the previous hearing and the present hearing, there had been no showing that circumstances had changed so that it would now be to L.L.'s benefit to postpone permanency planning to grant Mother additional services with the goal of returning L.L. to Mother. The court then made the required findings pursuant to section 366.26, terminated parental rights and set the matter for a permanency planning hearing.

Mother timely appealed from the court's section 388 and 366.26 orders.

### III. DISCUSSION

Mother argues that the trial court abused its discretion in denying her section 388 petition. We disagree.

Section 388 provides a means for the court to consider a legitimate change of circumstances, even at the permanency planning stage, that may justify a change to a prior order. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) It permits "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . [to], upon grounds of change of circumstances or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ." (§ 388, subd. (a)(1).) Section 388 allows the juvenile court to modify an order if a party establishes, by a preponderance of the evidence, that changed circumstances or new evidence exists and the proposed change would promote the child's best interest. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

The burden of proof is on the party bringing the petition to show both the existence of a genuine change in circumstances and that the proposed change is in the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529; § 388, subd. (b).)

Whether a prior order should be modified rests within the discretion of the juvenile court and its determination will not be disturbed on appeal absent a clear abuse of discretion. (*In re Stephanie M., supra,* 7 Cal.4th at p. 318; *In re Kimberly F., supra,* 56 Cal.App.4th at p. 522.) On review, we ask whether the juvenile court's order " 'exceeded the bounds of reason.' " Further, " 'when two or more inferences may reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M., supra,* 7 Cal.4th 295, 318-319.)

Six months before Mother filed her petition, she was just beginning to address her mental health issues. Her visits with L.L. were difficult and L.L. was anxious about them. The juvenile court based its July 16, 2012 order on the fact that because of issues with Mother's mental health problems and her relationship with L.L., it was appropriate to terminate reunification services and set the matter for a section 366.26 hearing. In the months that followed, Mother worked diligently and successfully to stabilize her challenging mental health situation. She also continued to visit L.L. Although evidence

12

of Mother's efforts to address her mental health issues might constitute a change in circumstances, the record evidences no similar change in Mother's relationship with L.L. Instead, L.L. now set clear boundaries with Mother during their visits, and did not identify Mother as her mother. As Mother herself candidly observed, "she does favor the people who are in her life most. I think that she's only comfortable with me like in a play setting and stuff."

Not only did Mother failure to meet her burden of proof that her relationship with L.L. had significantly changed, but the fact that it had not supports the court's conclusion that granting this motion would not be in L.L.'s best interests. At this point in the process, "After the termination of reunification services, [Mother's] interest in the care, custody and companionship of [L.L.] is no longer paramount. (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.) Rather, at this point, the focus shifts to the needs of the child for permanency and stability. (*In re Marilyn H.* [, supra,] 5 Cal.4th [at p.] 309.)" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) Given that the bond between Mother and L.L. was a weak one, the court did not abuse its discretion in concluding that granting the section 388 motion and further delaying L.L.'s achievement of permanency and stability was not in her best interests.

## IV. DISPOSITION

The orders appealed from are affirmed.

13

                                          _____
                                          Haerle, Acting P.J.

We concur:


_____
Richman, J.


_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.